# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-2990

In the matter of:

STARNET, INC.,

*Debtor-Appellee*

Appeal of: GLOBAL NAPS, INC.; GLOBAL NAPS REALTY,
INC.; and GLOBAL NAPS NETWORKS, INC.,

*Appellants*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 03 C 4835—**Milton I. Shadur**, *Judge*.

_____

ARGUED DECEMBER 1, 2003—DECIDED JANUARY 9, 2004

_____

Before POSNER, EASTERBROOK, and ROVNER, *Circuit
Judges.*

EASTERBROOK, *Circuit Judge.* StarNet is an intermediary
between local telephone networks and the Internet. It
contracts with Internet Service Providers (ISPs) such as
Earthlink and AOL to maintain a network—including a
pool of modems—that will accept local calls and transfer the
data to the ISPs over high-speed lines that StarNet owns or
maintains. ISPs then publish local access numbers at which
their customers may connect without incurring
long-distance charges. StarNet must in turn contract with
local exchange carriers for phone lines and numbers at

which the calls may be received and transferred to the high-speed network. Instead of buying local service from SBC, Verizon, and other Baby Bells spun off from AT&T in the 1982 divestiture, StarNet prefers to acquire service from new carriers (called competitive local exchange carriers or CLECs) that have flourished since the Telecommunications Act of 1996. For reasons we need not relate, these CLECs have been able to enter into advantageous financial arrangements with the Baby Bells that make it less costly for them to operate a service that terminates many calls while originating few—a good description of calls that are bound for an ISP's local-access numbers. See *Illinois Bell Telephone Co. v. WorldCom Technologies, Inc.*, 179 F.3d 566 (7th Cir. 1999). So StarNet has contracted with these specialized CLECs for local-access service. To reduce costs still further, StarNet enters into co-location (or "collocation") agreements with these CLECs under which StarNet's modems are placed at the CLEC's premises, and the handover to StarNet's high-speed network occurs there.

Today StarNet is in bankruptcy. It has sought to escape what are, at least in retrospect, high-price contracts with Global NAPs for local-access service in three east-coast markets: New England; Washington, D.C.; and Miami. Bankruptcy law allows debtors to reject the executory portions of their contracts, see 11 U.S.C. §365(a), and StarNet exercised this option in order to obtain service from other CLECs at lower prices. But there was a catch: new CLECs would assign StarNet new local-access numbers. The ISPs have publicized numbers for their customers to use. A customer who dials such a number and finds it dead (because it was one of the numbers that Global had furnished) will choose another from the ISP's list—and the replacement may route service to some other network, for major ISPs contract with multiple intermediaries in large markets. StarNet does not want to lose business, so it asked Global to port the existing numbers to other CLECs.

"Porting" in telecom parlance entails changing the entries in local or national routing tables so that a number invokes the services of a different carrier. The recent changes in the FCC's rules that have required cellular carriers to port numbers to their rivals, and land-line carriers to port numbers to local wireless carriers, have drawn public attention to number portability. See *Cellular Telecommunications & Internet Association v. FCC*, 330 F.3d 502 (D.C. Cir. 2003); *In re Telephone Number Portability, First Report and Order and Further Notice of Proposed Rulemaking*, 11 F.C.C.R. 8352 (1996) ("First Report and Order"); and the agency's many follow-up decisions, most recently *In re Telephone Number Portability*, FCC 03-284 (Nov. 10, 2003). Global refused to port its numbers, observing that the contracts (which anyway StarNet had rejected) imposed no such obligation. Global insisted that federal statutes and rules likewise do not oblige it to accommodate StarNet's demand. It contended that opening these number blocs to porting would require costly changes to its network (costs that StarNet did not agree to cover) and permit erosion of business in the future by making it easier for other customers to jump ship.

Bankruptcy Judge Squires issued an injunction compelling Global to port the local numbers to other CLECs that had agreed to furnish StarNet with service. The injunction rests on 47 U.S.C. §251(b)(2), part of the 1996 Act. This section requires carriers "to provide . . . number portability in accordance with requirements prescribed by the [Federal Communications] Commission." Another provision of that Act defines "number portability" as "the ability of users of telecommunications service to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another." 47 U.S.C. §153(30). The FCC's First Report and Order implemented this statute without elaboration, requiring carriers to port

numbers to their rivals only "at the same location". The agency broached the possibility that in the future it might require porting to new locations and made it clear that carriers are free to furnish this service if they want (or agree by contract to do so), but that location portability is not now required. 11 F.C.C.R. at 8383 ¶58; see also 47 C.F.R. §52.21(q). Subsequent reports have stated that the Commission has "no current plans to address location portability at this time." *In the Matter of Telephone Number Portability—Second Memorandum Opinion and Order on Reconsideration*, 13 F.C.C.R. 21204, 21219-20 ¶¶29-30 (Oct. 20, 1998). The third and fourth reports (the latter in June 2003) leave matters unchanged.

The bankruptcy court concluded that StarNet had requested porting in order to "retain, at the same location, existing telecommunications numbers". Location is unaltered, the bankruptcy court stated, because StarNet's corporate headquarters count as the customer's location, and these are not moving. Although the modem pools would be moved from Global's premises, and incoming local calls thus would be terminated at a different place, the bankruptcy court concluded that this would not change the "location" to which the statute and regulation referred. The district court declined to stay this injunction and, when the judge made it clear that it would be some time before the court could act on Global's request for plenary review, Global filed an appeal to this court and requested a stay. We initially denied that motion but expedited the appeal. The day after oral argument, we entered a stay permitting Global to reclaim the numbers it had previously ported in order to comply with the injunction. Our stay was conditioned on Global's willingness (expressed in the bankruptcy court and reiterated here) to match the price and terms offered by the CLECs through which StarNet now prefers to obtain service. This opinion explains why we entered that stay and

what happens next: referral to the FCC so that the agency can clear up an ambiguity in its rules.

No one has a property interest in a phone number. 47 C.F.R. §52.107(a); see also *Jahn v. 1-800-FLOWERS.com, Inc.*, 284 F.3d 807 (7th Cir. 2002). The subscriber has at most a right to use a given number, and whether that number tags along when the customer switches carriers depends on contracts plus rules to be found in statutes and regulations. StarNet has no contractual right to portability—not only because StarNet has repudiated its contracts with Global but also because they would not require portability even if they remained in force. Lack of an obligation to port the numbers gives Global some holdup power—it can demand compensation for porting, or charge a higher price while service continues, but StarNet knew this when it got into the deals. Terms negotiated ex ante (not only price but also Global's willingness to house the modems, without extra charge, under a collocation agreement) may have compensated StarNet for the risk that it would be discomfited ex post by the need to pay Global for portability, or to abandon the numbers in order to switch carriers. Whether or not StarNet received compensation ex ante, however, the fact remains that neither §365(a) nor anything else in bankruptcy law entitles debtors to more or different services, at lower prices, than their contracts provide. Section 365(a) gives debtors a right to walk away before the contract's end (with the creditor's entitlement converted to a claim for damages, see *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984)), not a right to obtain extra benefits without paying for them. In the main, and here, bankruptcy law follows non-bankruptcy entitlements. See, e.g., *Raleigh v. Illinois Department of Revenue*, 530 U.S. 15, 20 (2000); *Butner v. United States*, 440 U.S. 48 (1979).

Thus the bankruptcy judge was right to focus attention on the 1996 Act and the FCC's regulations, which are the only

plausible source of an entitlement to portability. Section 153(30) of the 1996 Act defines the minimum required portability as "the ability of users of telecommunications service to retain, at the same location, existing telecommunications numbers". The bankruptcy court held that "location" for this purpose is the subscriber's residence—or, in case of a corporation, its headquarters. This is possible, we suppose, but it is implausible. Like many other corporations, StarNet does business nationwide. It would make little sense (and may pose technical difficulties) to say that StarNet could compel Global to port the numbers to any other carrier in the entire nation, so that local calls originating on Global's network in Miami could be terminated in Seattle. Either the user dialing into the ISP's system would receive a shock when an apparently local call was billed as a long-distance call, or Global would be compelled to bear for the indefinite future the cost of long-distance service. Nothing in the 1996 Act, or the FCC's implementing reports, suggests that either of these outcomes is required. So "location" cannot be the subscriber's corporate headquarters. The word "location" must refer to the place where the call is terminated or handed off to another carrier. When the phone stays in the same place—when, for example, a residential customer switches home service from SBC to WorldCom, and nothing else changes—we have an unambiguous example of porting at "the same location". But if the residential customer says: "Please use my old number at my new house a block away," things are more complicated. And StarNet's decision to move its modems may be equivalent to a householder moving to the next block (or perhaps the next zip code): the local exchange carrier must arrange to terminate the call at a different physical location.

One way to read "location" is as the end of the wire, the physical location where the call (and the phone service) terminates. If this is right, then moving the modem pool

moves the "location" and disentitles StarNet to portability. But there is another possible reading, less confined than the end of the wire yet more confined than "anywhere in the nation, as long as the corporate HQ does not move." On this reading, the "location" is the telephone rate center— the area within which all calls are treated the same for billing purposes. Usually a rate center corresponds to the group of customers (a subset of an area code) served by a given complement of telephone switching equipment. On this understanding, the local exchange carrier defines its own "location" by choosing where to put its switches and how to bill its customers. One termination point within the area covered by the switch then would be treated the same as any other.

Language in the regulations links "location portability" to movement "from one physical location to another", 47 C.F.R. §52.21(j), but does not distinguish among the customer's physical location, the end of the wire's physical location, or the rate center's physical location. A Q&A drafted by the Commission's staff, and posted on its web site, may assume that the "end of the wire" reading is correct, for it answers no to the question: "Does long-term telephone number portability mean that I can keep the same telephone number if I move across town or to another state?" See <http://ftp.fcc.gov/Bureaus/Common_Carrier/ Factsheets/portable.html>. But another state certainly, and across town probably, also would mean a new rate center, so this answer does not clearly distinguish the possibilities, and is in any event the view of the staff rather than the Commissioners. Just last November, after the parties had filed their briefs, the Commission made a new portability directive that seems more consistent with the rate-center reading. It required wireline carriers to port numbers to wireless carriers, when "the requesting wireless carrier's 'coverage area' overlaps the geographic location of the rate center in which the customer's wireline number is

provisioned, provided that the porting-in carrier maintains the number's original rate center designation following the port". *In re Telephone Number Portability*, FCC 03-284 at ¶22 (Nov. 10, 2003). This order did not explain the relation between the wireline-to-wireless porting and the "same location" restriction on wireline-to-wireline porting. But it assuredly requires wireline carriers to port numbers to destinations other than the original terminus of the physical wire that served the customer whose number will be ported. This implies, though it does not quite say, that the FCC thinks of the rate center as the "location" that matters.

At oral argument counsel for Global insisted that porting to wireless carriers is distinct, because a cell phone may roam anywhere. Yet the question at hand is not the relation between the wireless carrier and its customer, but the relation between the wireline carrier and a customer who wants to port a number to a new carrier. If Global is required to port a number to a T-Mobile or Cingular switch at a location different from the existing customer's physical address (provided that the wireless carrier's coverage area overlaps Global's rate center), what difference does it make how the wireless carrier will get the call to its own customer? Yet in some respects the FCC has treated wireless carriers differently; there is a general wireless-to-wireless portability rule, unaffected by any location or rate-center-overlap requirement. 47 C.F.R. §52.31. It is not out of the question, therefore, that the FCC would see things Global's way.

Instead of trying to divine how the FCC would resolve the ambiguity created by the word "location," we think it best to send this matter to the Commission under the doctrine of primary jurisdiction. This is not to say that the agency has *exclusive* jurisdiction, the original and strongest meaning of "primary jurisdiction." See *United States v. Western Pacific R.R.*, 352 U.S. 59, 64 (1956). We use

the phrase in its weaker sense, as a doctrine that allows a court to refer an issue to an agency that knows more about the issue. "The doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." *National Communications Association, Inc. v. AT&T Co.*, 46 F.3d 220, 222-23 (2d Cir. 1995). StarNet tells us that this is a no-no, because the FCC can't meddle in bankruptcy law, indeed that the bankruptcy court itself has "exclusive jurisdiction". Cf. *Arsberry v. Illinois*, 244 F.3d 558, 563-64 (7th Cir. 2001) (referral to FCC under primary jurisdiction inappropriate where the agency could not authorize the activities challenged in the suit). It is a considerable overstatement to call the bankruptcy court's jurisdiction exclusive; many subjects with effects outside the bankruptcy may be adjudicated outside as well. See, e.g., *FCC v. NextWave Personal Communications Inc.*, 537 U.S. 293 (2003), which allowed review outside bankruptcy of a license resale that affected a bankrupt estate. At all events, we would not ask the FCC any question about bankruptcy law; our need—and the subject on which the FCC can help—is to determine StarNet's non-bankruptcy entitlement, if any, to compel Global to port the numbers. That turns on the 1996 Act and its implementing regulations, the bailiwick of the FCC rather than a bankruptcy court. Only the FCC can disambiguate the word "location"; all we could do would be to make an educated guess. And although the FCC's position would be subject to review by the judiciary for reasonableness, the agency's views are the logical place for the judiciary to start.

We therefore refer this matter to the FCC with a request that it inform us how the "same location" restriction applies to a local exchange carrier that hands off traffic to a modem pool at a collocation facility, when the customer

wants to change local exchange carriers and move the modems. We issued the stay, restoring the parties to their original positions while the FCC ponders, because we are reasonably confident that the bankruptcy judge's use of corporate headquarters as the "location" is incorrect, because the record does not reveal whether the local exchange carriers with which StarNet now prefers to do business are in the same rate centers as Global's collocation facilities that housed StarNet's modems, and because Global offered to match the other carriers' prices and terms in the interim. Numbers are portable, or not, in 10,000-number blocs. To port StarNet's numbers to new carriers, Global had to open 100 or so 10,000-number blocs to porting. This created the risk of hard-to-calculate injury if some of Global's other customers should use the opportunity to port numbers before the FCC resolves this dispute. StarNet has not offered to compensate Global for that loss. Indeed, the bankruptcy judge did not require StarNet to post an injunction bond, so it cannot be required to reimburse Global for the costs of the original porting, and any business lost, even if Global prevails in the end. A stay pending a decision by the FCC curtails the losses to which Global is exposed without prospect of reimbursement, while protecting StarNet's interest in receiving prices and terms offered by the current competitive market.

This matter is referred to the FCC so that it may address the meaning of the word "location" for purposes of wireline-to-wireline portability. The stay remains in effect pending further order of this court. Within 21 days after the FCC renders its decision, the parties may file memoranda advising the court about the significance of the agency's action and what remains to be done to wrap up this litigation.

A true Copy:

    Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*